IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No.  06-cv-01135-WYD-MJW
(consolidated with Civil Action Nos. 06-cv-01207-WYD-MJW and
06-cv-01602-WYD-MJW)

STATE FARM FIRE & CASUALTY COMPANY, INC.;
HARTFORD UNDERWRITERS INSURANCE COMPANY;
PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD;
HARTFORD FIRE INSURANCE COMPANY;
ALLSTATE INSURANCE COMPANY;
WALLACE WHITE;
LAURIE GLAUTH, individually and as trustee for the Zelma Worden Trust;
CHARLES PHILLIPS, individually and as Trustee for the Phillips Family Trust I;
MARCIA PHILLIPS;
GARY BIESKE; and
SANDRA BIESKE,

      Plaintiffs,

v.

UNITED STATES OF AMERICA,

      Defendant.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

THIS MATTER is before the Court on a trial to the Court held on September 8-

12, 2008.  After considering the testimony of the witnesses, the credibility of the

witnesses, the exhibits submitted, and the arguments of counsel, I enter the following

Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1.  The United States Forest Service (Forest Service) is an agency within the

United States Department of Agriculture.  TR: 191:9 - 24.  The Forest Service is

responsible for managing the National Forests of the United States.  The Pike National Forest is located in Colorado.  TR: 310:1 - 4.

2.  On May 13, 2002, Abigail R. Kimball, the Forest Supervisor for the Pike and San Isabel National Forests, issued Order No. 02-05, pursuant to 36 C.F.R. § 261.50(a) (Fire Ban Order).  The Fire Ban was effective at 12:00 a.m. on May 14, 2002.  TR. 178:13 - 22; Def. exh. A-1.

3.  The Fire Ban Order prohibited building, maintaining, attending or using a fire, campfire, charcoal grill or coal or wood burning stove on all Forest Service land within the Pike and San Isabel National Forests (Fire Ban).  TR. 178:13 - 22; Def. exh. A-1.

4.  On June 8, 2002, Terry Barton was employed by the Forest Service as a Forestry Technician.  She was assigned to the South Park Ranger District in the Pike National Forest.  TR. 175:16 - 176:16.

5.  Terry Barton's Forestry Technician position description stated that she was to spend forty-five percent of her time working in road management, forty-five percent working in recreation and ten percent supervising seasonal recreation road crews.  TR. 176:17 - 177:8; Def. exh. A-2.

6.  The Forest Service assigned Ms. Barton collateral duties as Forest Protection Officer, which meant that she was authorized to issue violation and warning notices for acts prohibited by Section 36 of the Code of Federal Regulations, or any special orders in effect, that were observed by her during daylight hours.  A Forest Protection Officer is not a law enforcement officer.  TR. 177:17 - 178:12; 386:23 - 387:21.

7.  In June 2002, Terry Barton had a certification as a firefighter 2, which is the

basic entry level firefighter certification.  This certification allowed Barton to be a fire crew member under the supervision of a crew or engine boss.  TR. 179:11 - 181:12.

8.   The Fire Ban was in effect on June 8, 2002.  The Forest Service disseminated the Fire Ban Order via e-mail to all employees of the Forest Service South Park District Office in Colorado.  Terry Barton was aware of the Fire Ban Order on June 8, 2002.  TR. 194:4 - 195:4.

9.   On June 8, 2002, at approximately 9:15 a.m., the National Weather Service issued a Red Flag warning for north central Colorado to remain in effect until June 9, 2002.  The Red Flag Warning was repeated at 2:00 p.m.  The  Red Flag warning meant that the weather conditions were favorable for the rapid spread of wildfires.  TR. 312:24 - 314:4; Def. exh. A-13.

10.   Terry Barton knew of the existence and meaning of the Red Flag Warning on June 8, 2002.  TR. 588:6 - 18.

11.   On June 8, 2002, Terry Barton was on duty and left the South Park District Lake George Station in a Forest Service truck to patrol parts of the Pike National Forest sometime that afternoon.  Barton's shift was scheduled to end at 5:00 p.m.  Pl. exh. 6.

12.   On June 8, 2002, at approximately 4:55 p.m., Terry Barton made a radio broadcast that was heard by Mark Lawler, a Forest Service Fire Engine Crew Chief, who was located at the Lake George Station.  Barton reported that she had discovered an escaped campfire off Forest Road 290, that the fire was torching in trees, and that she needed an engine to respond.   TR.  359:21 - 17; Pl. exh. 26.

13.   Mike Hessler, the Forest Management Officer (FMO) for the Pike National

Forest, also heard a radio transmission from Barton at about 4:55 p.m. Hessler heard Barton report a fire that was approximately 20' x 20' in Ponderosa trees and grass with some torching. TR. 315:5 - 317:23; Def. exh. A-4.

14. Because of the weather and drought conditions, FMO Hessler believed that the fire would spread quickly and that Terry Barton would not be able to contain it by herself. Therefore, he told Barton to provide a legal description of the fire location because he thought it was more important to direct air suppression resources to the location. Barton provided the legal description and Hessler immediately ordered four fire engines, two Type I airtankers, a 5 person handcrew, a Type J helicopter (2000 gallon tank), and a Type 3 helicopter to respond to the fire. TR. 317:25 - 318:12, 332:17 - 333:18, 338:6 - 18.

15. Engine 1061, which was located at the Lake George Work Station, responded to the fire shortly before 5:00 p.m. Mark Lawler was the crew leader for Engine 1061 and its 3 person crew. The Lake George Work Station was located approximately 8 miles from the fire's original location. It took engine 1061 approximately 15 minutes to reach the fire scene. Shortly after leaving Lake George, Mark Lawler observed dark brown and black smoke from approximately 5 miles away. Brown and black smoke indicated that the fire was burning heavy fuels such as trees. TR. 359:23 - 361:4, 372:7 - 18; Pl. exh. 25.

16. When he arrived at the area of the campfire ring at 5:13 p.m. Mark Lawler observed that the fire was in the pine trees with multiple torching crowns, was 3 to 4 acres in size, and was burning on 3 sides. TR. 361:22 - 363:16; Def. exh. A-4.

17.  At 5:14 p.m., FMO Mike Hessler ordered two engines and two water tenders from the Lake George Volunteer Fire Department, two Forest Service fire engines from Woodland Park, and a Hot Shot Crew stationed in Salida to respond to the fire. Additional assets and personnel were called to help fight the fire between 5:45 and 6:00 p.m.  TR: 308:10 - 310:4; 317:21 - 323:13.

18.  Forest Service employee Kim Martin was the Type I Incident Commander for the forest fire (Hayman Fire) from June 9 through June 16, 2002.  The Incident Commander is the person with overall authority for making decisions on how to fight a wildfire.  The Forest Service committed substantial manpower and resources in an attempt to control and suppress the Hayman Fire.  TR. 391:16 - 394:12; Def. exh. A-12.

19.  On June 10, 2002, Forest Service Special Agent (SA) Kim Jones was assigned to investigate the Hayman Fire and went to the area of the campfire ring.  The campfire ring was located in a small meadow that was bordered by FR 290 on the south, and was surrounded by tress to the north, east and west.  The closest trees were located approximately 38 feet to the northwest of the campfire ring.  TR. 269: 19 - 270:15; Def. exh. B-2.

 20.  SA Jones observed that the rocks forming the campfire ring had gaps, and a large triangle shaped rock was not touching the ground.  The rock appeared to have been moved because its outline could be seen in the dirt below it.  A smaller rock (prop rock) was located under the triangle rock as if to prop it off the ground.  There were gaps under the triangle rock on both sides of the prop rock.  SA Jones observed burn patterns in the grass under the triangle rock, and concluded that the fire escaped from

that ring at that location, as well as other locations where grass had grown between and over the rocks. TR. 274:18 - 276:6; Def. exhs. C-20 & C-24.

21. SA Jones found three matches in close proximity to each other within the campfire ring. The matches were located on a burned clump of grass within the ring, that continued unimpeded to locations outside the ring. TR. 277:22 - 280:14; Def. exhs. 22, 23, 25 & 26.

22. SA Jones concluded that the fire spread from the campfire ring to surrounding grass, small timber and pine needles, predominately in a northerly direction. TR. 273:22 - 274:8; Def. exh. B-11.

23. On June 10, 2002, Terry Barton was interviewed by Forest Service SA Jones and did not admit to any involvement in starting the Hayman Fire. Barton claimed that she discovered the fire after she smelled smoke from about a mile away. Barton claimed that the fire was approximately 20' x 20' when she discovered it. TR. 282:1 - 283:6; Pl. exh. 2.

24. On June 10, 2002, Barton also provided SA Jones with a signed written statement. In this statement Barton maintained that she discovered the fire after she smelled smoke. Barton stated that the fire was 20' x 20' and was beneath the Ponderosa Pine trees when she discovered it. She stated that the fire was torching in the trees when Mike Hessler asked for a legal description. TR. 284:10 - 285:20; Pl. exh. 7 to 27.

25. On June 12, 2002, Forest Service Fire Investigator, Paul Steensland, investigated the campfire ring and also concluded that the fire originated in the ring and

spread to surrounding grass, pine needles and small timber predominately in a northerly direction. Steensland and Jones found a location where the prop rock appeared to have been prior to being placed under the triangle rock. They also found an indentation under the triangle rock indicating that it had been intact with the ground. Steensland examined the burnt material in the campfire ring and did not find any remnants of burnt paper. He did find some burnt twigs in addition to burnt grass. TR: 512:13 - 513:9; 514:4 - 515:9; 516:14 - 518:15; 524:11 - 525:3.

26. On June 13, 2002, Terry Barton was interviewed by SA Jones and Paul Steensland. Barton again denied any involvement in starting the fire, and maintained that she discovered it after smelling smoke from about a mile away. TR. 285:22 - 287:7; 284:7 - 9; Pl. exh. 3.

27. A video re-enactment of Barton's actions was recorded. During this re-enactment, Barton stated that the fire was torching in the trees before Mike Hessler asked for the legal description. She demonstrated that she used a shovel to throw dirt on the base of a tree to try and keep it from torching. Jones and Steensland observed some scrape marks in dirt near the tree and some dirt that appeared to have been thrown at the base of the tree. Barton also demonstrated how she returned to her truck to retrieve a map to provide the legal description to Mike Hessler and Pueblo Dispatch. TR: 287:8 -11; Def. exhs. G-2 & G-3.

28. On June 15, 2002, SAs Jones and Luke Konantz interviewed Terry Barton again. SA Konantz confronted Barton with inconsistencies between her statement and the physical evidence. Eventually, Barton stated that she had accidentally started the

fire by lighting a two page letter from her husband in the campfire ring with one match. She stated that after watching the paper burn to ash, she drove about two tenths of a mile west on FR 290, turned around and proceeded back east on FR 290. Upon approaching the small meadow she observed a fire emanating from the campfire ring sweeping north towards some trees. Barton demonstrated her actions which were videoed. TR: 210:20 - 216:10; 419:12 - 426:8; Def. exh. G-1.

29. Barton then provided a written statement. In the written statement, Barton claimed that she had filed for divorce. She stated that on the morning of June 8, 2002, her husband John, had given her a letter at her residence, and stated that he had burned the divorce papers. Barton stated that while on patrol later in the day, she looked at the letter but did not read it. She stated that this letter upset her, so she decided to burn it when she saw the campfire ring. She stated that she burned the letter with matches that she had in her purse. She then left the area in her truck thinking the letter had burned itself out. She drove down FR 290 to the intersection with FR 290A and drove back past the campfire ring. She stated that she then saw that fire was around the trees. Pl. exh. 2.

30. On June 15, 2002, Terry Barton gave a book of matches to SA Jones and claimed that was the book that the match she used to light the fire came from. The book was missing 3 matches. Upon seeing this, Barton stated that she must have used 3 matches. The book of matches and the 3 matches that SA Jones found in the campfire ring were compared by the Bureau of Alcohol, Tobacco and Firearms (ATF). ATF determined that the matches SA Jones found did not come from the matchbook.

TR: 232:4 - 234:6.

31. On June 16, 2002, SA Konantz interviewed John Barton. During this interview Mr. Barton denied that he gave Terry Barton a letter, and stated that on the morning of June 8, 2002, he was sleeping on the porch of their house and did not see Terry. He also denied that he told Terry that he had burned the divorce papers. TR. 415:12 - 419:9; Def. exh. G-4.

32. On June 17, 2002, Sarah Mayben, Terry Barton's second level supervisor, told Forest Service SAs Dan Mason and John Vasquez, that on June 15, 2002, Barton told her that the letter from John Barton stated that Satan had taken over her life and that she needed to come back to him or they would all go to hell. Exh. 29.

33. Mark Lawler told Forest Service Special Agents that Barton told him that her husband's letter referred to her as Satan. Pl. exh. 26.

34. Terry Barton did not see John Barton on the morning of June 8, 2008, because she spent the night at a co-worker's house, and drove directly to work. TR. 602:11 - 18.

35. On December 6, 2002, in the United States District Court for the District of Colorado, Terry Barton pleaded guilty to Setting a Fire on Lands of the United States in violation of 18 U.S.C. § 1855, and Making a False Statement within the Jurisdiction of the United States in violation of 18 U.S.C. § 1001. Def. exh. A-5.

36. When she pleaded guilty, Terry Barton admitted under oath that she placed a two page letter from her husband in the campfire ring on June 8, 2002, and lit it with a match. She admitted that after watching the paper burn to ash, she drove about two

tenths of a mile west on Forest Road 290, turned around and proceeded back east on Forest Road 290. Upon passing the campfire ring she observed a fire emanating from the campfire ring sweeping north towards some trees. Def. exh. A-5

37. When she pleaded guilty, Terry Barton also admitted that she provided false statements to Forest Service law enforcement agents on June 10 and 13, 2002, about her involvement in starting the Hayman Fire. Def. exh. A-5.

38. Judgment was entered against Terry Barton on February 23, 2003, and she was sentenced to 72 months in the custody of the U.S. Bureau of Prisons. Def. exh. A-6.

39. At the trial in this matter, Terry Barton testified that on June 8, 2002, she was emotionally upset by a letter that her husband had given her. She claimed that while emotionally distraught, she burned the letter in the campfire ring, and then left the area thinking it had burned out. She testified that she drove her truck down FR 290 to the point that it intersected with FR 290A. At that point she decided to turn around because that was the fastest route back to the Lake George Station. She testified that as she approached the area where the campfire ring was located, she observed that a fire was burning in the grass. Barton stated that she then parked her truck and reported the fire on her radio. She then tried to suppress the fire with a hand tool but was unsuccessful because it was too big for her to put out. TR. 567:7 - 569:7, 580:11 - 583:1, 589:13 - 601:25.

40. According to Defendant's fire behavior expert Henry Goehle, the fire could have spread to the Ponderosa Pine trees located approximately 38 feet to the northwest

of the campfire ring in 45 seconds to 1 ½ minutes once it was established outside the ring.  This calculation was made using the Behave Plus computer model which is used to calculate rates of spread and flame length by experts in the field of fire behavior.  TR: 450:15 - 460:4.  I found Mr. Goehle's testimony credible.

41.   According to the testimony of fire behavior expert, Mark Finney, an employee of the Forest Service who was called by Plaintiffs, the fire could have reached the closest trees in as little as 30 seconds, but took no longer than 5 minutes at the most.  Dr. Finney also used the Behave Plus computer program to make his calculations.  TR: 148:2 - 150:16.

42.   Based on the evidence,  I am not persuaded that Terry Barton lit the fire intending that the fire escape the campfire ring.  I find that Terry Barton emotionally lit a letter which in turn ignited the grass within the ring.  As such, Terry Barton violated the Fire Ban and committed the felony offense of Setting a Fire on Lands of the United States in violation of 18 U.S.C. § 1855.

43.   Within a short time after Barton lit the grass or letter, fire escaped from the campfire ring when grass in gaps in the ring and grass that had grown over the rocks burned.  Once it escaped the ring, the fire spread rapidly through the surrounding grass and pine duff and began torching in trees that were generally located to the north, northeast and northwest of the ring.   Due to the extremely windy conditions the torching trees began to crown which caused the fire to spread even more rapidly.  TR. 455:4 - 460:23.

44.   The Forest Service's overriding policy and objectives for fighting forest fires

are set forth in § 5102 of the Forest Service Manual, which states, "Forest service fire management activities should result in safe, cost-effective, fire management programs that protect, maintain and enhance National Forest System lands."  Def. exh. A-19.

45.  Concerning fire suppression, § 5130.2 of the Forest Service Manual states, "Safely suppress wildfires at minimum cost consistent with land and resource management objectives and fire management direction as stated in Fire Management Plans."  Def. exh. A-20.

46.  Concerning fire suppression, § 5130.3 of the Forest Service Manual states:

> 2.  Responsible officials shall conduct fire suppression in a timely, effective, and efficient manner, giving first priority to firefighter and public safety.
>
> 3.  In making decisions about how to organize and conduct suppression operations (suppression strategies), line officers shall minimize both suppression cost and resource loss consistent with the resource management objectives for the values to be protected.  Consider fire behavior, the availability of suppression resources, the values of natural resources and property at risk, direction in the land and resource management plan, and the potential cost of suppression.  Use a Wildland Fire Situation Analysis to document suppression strategy decisions (FSM5131.1).

Def. exh. A-21.

47.  The National Fireline Handbook (PMS 410-1) states that "The strategy used to control a fire depends on the rate of spread, intensity, spotting potential, values at risk, size, type of available resources, and other factors."  These guidelines are incorporated into Forest Service  policy by the Forest Service Handbook.  Def. exh. A-22.

48.  Chapter 06 of the Interagency Standards for Fire and Fire Aviation

Operations (NFES 2724) states, that "Firefighter...safety is our first priority...safety comes first on every fire, every time...every individual has the right to turn down unsafe assignments..."  Further, it states that "Individuals may turn down as unsafe when...environmental conditions make the work unsafe...[or] they lack the necessary qualification or experience...."  These guidelines are incorporated into Forest Service policy by the Forest Service Handbook.  Def. exh. A-23.

49.  Every wildfire is different and calls for different fire control actions based on variables including fire size, fire behavior, fire intensity, rate of spread, fuel type, weather, terrain and topography, resources available, accessibility, and values threatened.  TR.  94:16 - 24; 158:25 - 159:16; 376:8 - 23; 395:17 - 396:1; 461:22 - 462:25.

## CONCLUSIONS OF LAW

1.  The United States is immune from suit, except to the extent of its consent. *United States  v. Mitchell*, 463 U.S. 206, 212 (1983).  The Federal Tort Claims Act (FTCA) is a limited waiver of sovereign immunity, and its terms expressly define the limits of a district court's subject matter jurisdiction.  *United States v. Orleans*, 425 U.S. 807, 813-14 (1976).  The burden of establishing jurisdiction is on the plaintiff.  *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936).

2.  The FTCA waives sovereign immunity for civil actions for monetary damages caused by the negligent or wrongful act or omission of any employee of the United States acting within the scope of his or her employment.  This tort liability is limited to circumstances where the United States, if a private person, would be liable to the

claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 1346(b) and 2674.

3. In determining whether an employee acted within the scope of employment, the law of the place where the act or omission occurred controls. 28 U.S.C. § 1346(b); *Pattno v. United States*, 311 F.2d 604, 607 (10th Cir. 1962). The negligent or wrongful act of starting the Hayman Fire occurred in Colorado. Under the doctrine of respondeat superior adopted in Colorado, an employee acts within the scope of his employment "if he is doing the work assigned to him by his employer, or what is necessarily incidental to that work, or customary in the employer's business." *Moses v. Diocese of Colorado*, 863 P.2d 310, 330 (Colo. 1993).

4. An employer is only liable under respondeat superior if express authority was given to the employee or "if the servant's conduct was in some way caused by an intent to serve his employer's interests and connected with his authorized acts." *Grease Monkey International, Inc. v. Montoya*, 904 P.2d 468, 473 (Colo. 1995), *quoting* Warren A. Seavey, *Handbook of the Law of Agency* § 83(B) (1964). Vicarious liability does not arise when the negligent acts of an employee are not for the benefit of the employer. *Cooley v. Eskridge*, 241 P.2d 851, 856-57 (Colo. 1952) (holding that coal company employee's negligent use of plaintiff's tractor was not for the benefit of the coal company but was undertaken for plaintiff's advantage).

5. An employee's violation of a policy established by the employer is evidence that the requirements for vicarious liability have not been met. *Moses,* 863 P.2d at 330; *Destefano v. Grabrian*, 763 P.2d 275, 287 (Colo. 1988).

6.  Intentional conduct is usually outside of the "normal risks to be borne by the business in which the servant is employed." *Moses*, 863 P.2d. at 329 n.27, *quoting Restatement (Second) of Agency* § 229.  "Although the commission of an intentional tort may sometimes be within the scope of employment, the agent's intent in committing the tortious act must be to further the employer's business." *Id.*

7.  The fact that Barton was on-duty and on Forest Service property when she lit the fire in the campfire ring does not establish that she was acting within the scope of her employment.  *Destefano*, 763 P.2d at 287 and *Moses*, 863 P.2d at 330 (holding that the negligent acts were not within scope of employment in spite of the fact that they were performed while on duty and on employers' premises); *Lombardy v. Stees*, 290 P.2d 1110, 1111 - 13 (Colo. 1956) (holding that respondeat superior did not apply because bartender's assault of bar patron was for personal reasons and not to maintain the order of the bar); *Beeson v. Kelran Constructors, Inc.*, 608 P.2d 369, 371 (Colo. Ct. App. 1979) (holding that employee left scope of employment when he stopped company truck to participate in horseplay on the highway).

8.  When Barton violated the Fire Ban she was not doing the work assigned to her, what was necessarily incidental to that work, or what was customary in the Forest Service's business.  Barton's act of lighting the letter or grass was for her own purpose and was not to further the business of the Forest Service.  Barton violated the Fire Ban and contravened the established policy of the Forest Service when she lit the letter or grass in the campfire ring.  Thus, she acted outside the scope of her employment.  *See Moses*, 863 P.2d at 330.

9.  Section 237 of the *Restatement (Second) of Agency* provides that "A servant who has temporarily departed in space and time from the scope of employment does not re-enter it until he is again reasonably near the authorized space and time limits and is acting with the intention of serving his masters business."

10.  Section 7.07(2) of the *Restatement (Third) of Agency* provides in part that: "An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer."

11.  In Colorado, courts may apply sections of the restatement as a formulation of the law that is applicable to the issue before the court, but do not have the authority to adopt a section of the restatement as the law. *Grease Monkey International, Inc.,* 904 P.2d at 470 n.2.

12.  There is insufficient evidence to establish that Barton returned to the scope of her employment immediately after lighting the letter or grass in the campfire ring. When she committed a felony by lighting a fire during a fire ban, in a campfire ring that had dried grass within it that had grown over the rocks and through gaps in the ring, Barton deviated so materially and substantially from the scope of her employment, that leaving the area of the campfire ring without making sure that the fire was completely out cannot reasonably be viewed as a re-entry into the scope of her employment. *See Kirchoffner v. United States*, 765 F.Supp. 598, 601 (D. N.D. 1991). Barton's failure to make sure the fire would not escape from the ring is so intricately connected with lighting the fire in the first instance, that it cannot be viewed as a negligent act distinct

from the commission of the felony. The evidence is insufficient to establish that Terry

Barton acted with the intention of serving the Forest Service's business immediately

after she committed the felony. The evidence establishes that Barton was distraught

and was not thinking clearly. Lighting the fire and failing to make sure it was out was an

independent course of conduct not intended to serve any purpose of the United States.

When she left the scene of the felony, Barton was not doing the work assigned to her,

what was necessarily incidental to that work, or what was customarily the Forest

Service's business.

13. After lighting the fire, Barton did not act within the scope of her employment

until she returned to the scene of the fire.

14. While still in her truck, upon discovering the fire, Barton used her Forest

Service radio to report the fire. Barton made an attempt to suppress the fire. While

fighting the fire, Barton provided a legal description of the location of the fire so that

aircraft could be sent to the location. Barton put on her protective Nomex shirt and

returned to fight the fire, but saw that the fire was then torching in the trees. Therefore,

I find that her fire suppression efforts were within the scope of her federal employment.

15. FTCA tort liability is limited to circumstances where the United States, if a

private person, would be liable to the claimant, in accordance with the law of the place

where the act or omission occurred. 28 U.S.C. §§ 1346(b) and 2674. The private

person component of an FTCA claim means that the federal government must be

compared to a non-public entity. *Ewell v. United States,* 776 F.2d 246, 248-49 (10th Cir.

1985)*; Ortiz v. United States Boarder Patrol*, 39 F. Supp. 2d 1321, 1323-24 (D. N.M.

1999), *aff'd Ortiz v. United States Border Patrol,* 210 F.3d 390 (10th Cir. 2000).

16.  The elements of a negligence claim in Colorado are: (1) the defendant owed the plaintiff a legal duty to conform to a standard of care; (2) the defendant breached the duty; (3) the plaintiff suffered injury; and (4) there is a causal connection between the breach and the injury.  *Scott v. Matlack, Inc.*, 39 P.3d 1160, 1166 (Colo. 2002); *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992).

17.  Relevant factors in determining whether the law imposes a duty on the defendant include: (1) the risk involved; (2) the foreseeability of harm to others and likelihood of injury as weighed against the social utility of the actor's conduct; (3) the magnitude of the burden of guarding against the injury or harm; and (4) the consequences of placing the burden on the actor.  These factors are not exhaustive, and other factors may be relevant based on the competing individual, public and social interests implicated by the facts.  Ultimately, the question is one of fairness - whether under contemporary standards, reasonable persons would recognize and agree that a duty of care exists.  *University of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo 1987).

18.  Plaintiffs' claim that Terry Barton negligently failed to prevent the fire from damaging their property is a nonfeasance claim.  Nonfeasance negligence involves passive inaction or a failure to take steps to protect someone from harm.  In nonfeasance cases a duty has been recognized *only* in a limited group of cases where a special relationship existed between the parties of such a character that social policy justified the imposition of a duty to act.  Special relationships that have been recognized include common carrier/passenger, innkeeper/guest, possessor of land/invited entrant,

employer/employee, parent/child and hospital/patient. *Id.* at 57-58. Because no special relationship existed between the Forest Service and the Plaintiffs, employees such as Barton had no duty to protect the private property from damage.

19. Even if Plaintiffs' claims are characterized as misfeasance, the Forest Service did not owe a legal duty to Plaintiffs to extinguish the Hayman Fire before it damaged their property, or to attempt to suppress the fire in any particular manner. One who undertakes to render services to protect a third person's property is subject to liability for harm resulting from the failure to exercise reasonable care only if: (1) his failure to exercise reasonable care increased the risk of harm; (2) he has undertaken to perform a duty owed to the third person; or (3) the harm is suffered because of reliance by the damaged party. *Cooper v. United States Ski Ass'n.,* 32 P.3d 502, 508 (Colo.App. 2000), *rev'd on other grounds,* 48 P.3d 1229 (Colo. 2002). None of these factors applies here. Moreover, the risk involved in suppressing a wildfire is substantial, as is the burden on firefighters to guard against injury or harm to private property. The consequences of placing the burden of compensating property owners on firefighters who fail to prevent a wildfire from damaging private property are enormous. Placing that potential financial burden on firefighters who fail to prevent fires from damaging property could deter volunteer firefighters from fighting wildfires. Volunteer fire departments would probably cease to exist if faced with the prospect of paying substantial damage judgments for failing to successfully suppress fires. Public and social interests require that individuals will be willing to put their lives at risk to fight wildfires, and that they have the discretion to balance multiple factors in determining

how best to fight the fires.  Every wildfire is unique and firefighters must make on-the-spot decisions on how to attempt to contain or suppress fires based on the circumstances they face and the resources available.  Under contemporary standards, reasonable persons would not recognize and agree that firefighters have a duty to prevent wildfires from damaging private property, or a duty to employ any specific fire suppression tactics.

20.  Plaintiffs contend that in Colorado, a landowner has a duty to prevent dangerous conditions, such as a fire, from escaping from his land.  However, Plaintiffs have not plead that theory of recovery in the complaints or the Pre-Trial Order.

21.  Even if that theory of recovery were considered, Plaintiffs have not established a breach of the recognized duty.  Colorado does recognize a landowner's duty to not permit land to remain in an altered state, if such altered state creates a condition that could naturally and foreseeably result in injury to an adjoining landowner's property.  Thus, a landowner has a duty to exercise reasonable care to prevent conditions or activities on his land from injuring property or persons outside his land. *Moore v. Standard Paint & Glass Co of Pueblo*, 358 P.2d 33, 36 (Colo. 1960).  The alteration of the land must be by artificial as opposed to natural forces.  *Haas v. Lavin*, 625 F.2d 1384, 1387 (10th Cir. 1980).  However, this duty is inapplicable to the facts of this case.  The United States did not permit the forest to remain in an artifically altered state that created a condition that could naturally and foreseeably result in injury to an adjoining landowner's property.  The government issued a fire ban.  Barton, acting on her own, violated the fire ban and created the dangerous condition.  Barton was not

acting within the scope of her employment when she started the fire. Consequently, the government did not knowingly permit its land to remain in a dangerous *artifically* altered state. The United States attempted to prevent a natural disaster, a wildfire, from escaping from its property, but it cannot be held liable for being unsuccessful under these circumstances.

22. Even assuming that Terry Barton returned to the scope of her employment immediately after she lit the fire in the campfire ring, the evidence is insufficient to establish that she negligently failed to prevent the fire from escaping the ring. Barton testified that the fire appeared to be completely out when she left the area of the ring, and she did not discover that the fire had escaped from the ring until several minutes later. Barton's failure to detect that the fire in the ring was not completely out before she left was not a breach of a duty owed to the Plaintiffs.

23. Having already found that Terry Barton returned to the scope of her employment after she reported the fire, the evidence is insufficient to establish that her suppression efforts, if any, were negligent. Barton had no duty to attempt to suppress the fire by herself with a hand tool, or to do so in any particular manner. Barton has indicated that she attempted to throw dirt on the base of a tree to keep it from torching. There is no evidence that this suppression technique was negligent. Furthermore, there is insufficient evidence to establish that any particular suppression technique was required. The evidence established that all wildfires are different and require individual assessments of the suppression techniques that can be safely utilized. The evidence is insufficient to establish that Barton tried to stomp the fire out with her feet for any

significant length of time.  If she did so, this action only lasted a few seconds on her way to throw dirt on the tree.  This action was so brief that it cannot be considered the breach of a duty owed to the Plaintiffs.

24.  The Forest Service did not breach any duty owed to Plaintiffs.  The Forest Service immediately committed fire suppression assets to fight the fire.  These included fire trucks, helicopters, air tankers, and ground crews.  There is no evidence that would allow a reasonable trier of fact to conclude the Forest Services' suppression efforts were negligent.

25.  Plaintiffs have failed to prove that negligent suppression efforts by Terry Barton or other Forest Service employees caused their damages.  To establish causation, Plaintiffs are required to prove that their injuries would not have occurred but for the Defendant's negligent conduct.  *Moore v. Standard Paint & Glass Co.,* 358 P.2d 33 (1960).

26.  The evidence is insufficient to establish that Barton could have suppressed the fire by herself with a hand tool.  The weather and drought conditions caused the fire to spread very rapidly in three directions.  The evidence demonstrates that when Barton first observed that the fire had spread from the campfire ring, it had reached the closest trees.  Moreover, the evidence is insufficient to establish that even if Barton had been successful in keeping the fire from reaching the closest trees, that the fire would not have spread to other trees.  The testimony of Plaintiffs' expert, Kirk Schmitt, that Barton could have easily suppressed or contained the grass fire by herself, is speculative and is not based on any recognized scientific methodology.  I find that Plaintiffs have failed

to prove by a preponderance of the evidence that Barton could have suppressed or contained the fire by herself.

27.    The FTCA's waiver of sovereign immunity is limited by the discretionary function exception, which states that the FTCA does not apply to "Any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

28.  When evaluating a claim under the FTCA, a court must first inquire as to whether the governmental action complained of involves an element of judgment or choice.  *United States v. Gaubert*, 499 U.S. 315, 322 (1991).  The second part of the analysis is whether the choice or judgment is one based on considerations of public policy.  *Id.* at 323.  The exception covers all discretionary acts, even if the act is negligently performed or involves an abuse of discretion.  *Dalehite v. U.S.*, 346 U.S. 15 30-32 (1953).

29.  A discretionary act is not limited to policymaking or planning functions. *Gaubert*, 499 U.S. at 325.  It is the nature of the conduct, in relation to the agency's policy mission and goals, that is determinative.  *Gaubert*, 499 U.S. 324, n.7.

30.  In the first tier of the discretionary function analysis, a court must determine if the actions taken are discretionary in nature, that is, whether they involve an element of choice.   "The discretionary function exception will not apply when a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow" and leaves the employee "no rightful option but to adhere to the directive."  *Berkovitz v.*

*United States*, 486 U.S. 531, 536.  However, agency policy manuals and regulations that only mandate broad policy goals still allow for discretion, in that the employees involved with implementation must determine when and how to meet the broad mandate.  In such situations, the discretionary function exception applies.  A general regulation or policy does not remove discretion unless it specifically prescribes a course of conduct.  *Tippett v. United States*, 108 F.3d 1194, 1197 (10th Cir. 1997); *Johnson v. United States,* 949 F.2d 332, 338 (10th Cir. 1992).

31.  The overriding policy and objectives of the Forest Service do not dictate how to fight forest fires and provide broad discretion to firefighters.   No mandatory directives exist that tell a Forest Service employee exactly how to fight any specific fire.  Every wildfire is different and requires different suppression tactics.  Firefighters must make discretionary decisions when fighting forest fires that depend on such things as safety, weather conditions, terrain, size of the fire, fuel, and resources available.  Decisions regarding how to fight a wildfire are discretionary and satisfy the first prong of the discretionary function analysis.

32.  In the second tier of the discretionary function exception analysis, a court must consider whether the governmental actions and decisions at issue were based on considerations of public policy.  *Gaubert*, 499 U.S. at 323; *Berkovitz*, 486 U.S. at 537.  The discretionary function exception protects "decisions grounded in social, economic, and political policy."  *Varig Airlines*, 467 U.S. at 813.  In *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), the Supreme Court expansively construed the exception to protect "judgment . . . balancing . . . technical, military and . . . social considerations."

*Id.* at 511.  However, the United States does not have to establish that the employees who made the decisions being challenged actually balanced the technical, economic or social considerations.  It is sufficient if the decision is susceptible to a policy analysis. *Sydnes v. U.S.*, 523 F.3d 1179, 1185-86 (10th Cir. 2008).

33.  The Forest Service's stated objectives and policies regarding fire suppression demonstrate that the decisions regarding how to attack a wildfire involve a balancing of considerations, including cost, public safety, firefighter safety, and resource damage.  These considerations reflect the type of economic, social and political concerns that the discretionary function exception is designed to protect.  *Miller v. United States*, 163 F.3d 591, 595-96 (9th Cir. 1998); *Parsons v. United States*, 811 F. Supp. 1411, 1421 (E.D. Cal. 1992); *Defrees v. United States*, 738 F. Supp. 380, 384 (D. Or. 1990).

34.  The decisions of Barton and other Forest Service employees regarding suppression of the Hayman Fire were grounded in social, economic, and political policy, and the second tier of the discretionary function analysis applies.  The discretionary function exception to the FTCA bars Plaintiffs' claims that Barton and other Forest Service employees were negligent in their efforts to suppress the Hayman Fire.

For the above stated reasons, it is

ORDERED that Judgment is entered in favor of the Defendant.

Dated:  November 25, 2008

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief U. S. District Judge